# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **MICHELLE T. MERRITT** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 11 C 9071** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Magistrate Judge Morton Denlow** |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant Michelle T. Merritt ("Claimant") brings this action under 42 U.S.C. § 405(g), seeking reversal or remand of the decision by Defendant Michael J. Astrue, Commissioner of Social Security ("Defendant" or "Commissioner"), denying Claimant's application for both Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Claimant raises the following issues in support of her motion: (1) whether the ALJ properly weighed the opinions of Claimant's treating physician in her finding of Claimant's residual functional capacity ("RFC"); (2) whether the ALJ's credibility finding regarding Claimant's testimony was patently wrong; and (3) whether the ALJ properly relied upon testimony of the vocational expert to conclude that a significant number of jobs exist which Claimant can perform. For the following reasons, the Court denies Claimant's motion for summary judgment or remand the decision of the Commissioner and grants the Commissioner's motion to affirm the same.

# I.   BACKGROUND FACTS

## A.   Procedural History

Claimant initially filed for DIB and SSI on January 12 and 18, 2007, respectively, alleging a disability onset date of July 2, 2003.  R. 137-39; 142-44.  The Social Security Administration ("SSA") denied her application on April 11, 2007.  R. 92-96.  Claimant then filed a request for reconsideration, which the SSA denied on March 7, 2008.  R. 98-101.  Shortly thereafter, Claimant requested a hearing before an Administrative Law Judge.  R. 102-03.

On November 19, 2009, Administrative Law Judge Judith S. Goodie ("ALJ") presided over a hearing at which Claimant appeared with her attorney, Violet Borowski.  R. 40-83.  Claimant and Michelle Peters, a vocational expert, testified at the hearing.  *Id*.  On December 30, 2009, the ALJ rendered a partially favorable decision finding Claimant disabled for the purposes of both DIB and SSI between January 1, 2006 and December 31, 2006.  R. 16-39.  From the alleged onset date of July 2, 2003 through December, 31 2005, and from January 1, 2007 through the date of the decision, the ALJ found Claimant not disabled.  R. 30.

Claimant then filed for review of the ALJ's decision to the Appeals Council, which was denied on September 1, 2011, making the ALJ's decision the final decision of the Commissioner.  R. 2-7.  Claimant subsequently filed this action for review pursuant to 42 U.S.C. § 405(g).  An oral argument was held on June 18, 2012.

**B.** **Hearing Testimony – November 19, 2009**

    **1.** **Michelle T. Merritt – Claimant**

At the time of the hearing, Claimant was 44 years-old, right-handed, and living with her sister. R. 48, 50, 137. Claimant stood 5'4", weighed 226 pounds, and had completed education through the twelfth grade. R. 53, 197, 205. Her most recent relevant work experience included positions as a homecare worker and a warehouse package auditor. R. 46-47. Claimant has not worked since December 2005 when she reinjured her left shoulder at work. R. 47.

During the hearing, Claimant explained that she has had three surgeries on her left arm. The first surgery occurred in 2003 and involved the insertion of a metal plate into her left forearm. R. 58. The second and third surgeries were both on her left shoulder. R. 57. Claimant testified that she still has constant pain in her left shoulder rating "between a five and a six," out of ten, even when she is not using that shoulder. R. 61. When she takes her medication, that pain decreases to "about a three or four." *Id*. Claimant testified that she takes a Tylenol and muscle relaxer every four to six hours. R. 62.

Claimant asserted that her activity is limited by both shoulder pain and the side effects of prescription drugs used to quell that pain. While she can drive and go to the store Claimant alleges that she gets "a sharp pain" when she elevates her arm. R. 49-50. As a result, her ability to perform household chores, such as cooking, cleaning, and laundry, is "very limited." R. 49-50, 52. When asked if she "ever lift[s her arm] above [her] shoulder level," Claimant answered "No." R. 60. Claimant confirmed that she can lift a gallon of

milk with her right hand.  R. 54.

Claimant stated that, due to her shoulder pain, she can stand for only "about a half hour" before needing to sit down, and she can sit for "at least 30 minutes" before needing to stand up.  R. 54, 66.  Claimant does not take walks or exercise.  R. 53.  She can walk approximately one block before having to rest due to shortness of breath.  R. 53-54.

Claimant's medications, the muscle relaxer in particular, make her drowsy.  R. 50. She testified that she sleeps up to four hours after each dose.  R. 45, 52, 61-63.  When she wakes up, she eats something, takes another dose, and goes back to sleep.  R. 63.  Claimant confirmed that she did not visit her doctor between April 2008 and August 2009.  R. 55.

## 2.    Michelle Peters – Vocational Expert ("VE")

Michelle Peters testified as a vocational expert.  The VE described Claimant's past relevant work of home care, characterized as a home health care provider, as low end, semi-skilled work performed at the medium demand level.  R. 67.  Claimant's warehouse auditor position would be similar to a shipping and receiving clerk, which is categorized as a semi-skilled occupation performed at both the medium and heavy levels of physical demand.  *Id*.

The ALJ first described an individual of Claimant's age, educational background, and work experience with the following limitations: "to lift and carry no more than 10 pounds, to sit up to six hours; stand and walk up to six hours; occasional pushing and pulling with the left upper; no reaching with the left above the shoulders, the left is the non-dominant; occasional stooping, crouching, and kneeling; no crawling; no ladders."  R. 68.  The VE

replied that the hypothetical individual could not perform Claimant's past work but the following positions are available in the national economy: order clerk, of which there are 1800; cashier, of which there are 1200; and inspection positions, of which there are 1800. The VE testified that the first hypothetical described a limited range of light work. R. 68-69.

In the second hypothetical, the ALJ further limited the same hypothetical individual to only be able to sit for thirty minutes and to stand for one hour at a time. R. 69. The VE testified that this would describe sedentary work. *Id*. This hypothetical person could perform the following jobs: assembly worker, of which there are 1500 available positions; inspection worker of which there are 1200 available positions, and information clerk, of which there are 950 available positions. *Id*.

The ALJ then added an additional limitation, that of only occasional use of the left, non-dominant upper extremity for fine and gross manipulations. R. 70. The VE testified that when this limitation is added to the first hypothetical—light work—the order clerk, cashier, and inspection positions would be eliminated, but information clerk, of which there are 2000 positions, and hostess, of which there are 2500 positions, would be available. *Id*. The VE explained that she did not originally cite these positions with regard to the first hypothetical because the additional limitations changed the dynamic of the question. R.72-74. When the same left upper extremity limitation was added to the second hypothetical—sedentary work—the VE testified that only 950 information clerk positions would be available. *Id*. The ALJ inquired, and the VE confirmed, that her testimony was consistent with the Dictionary of Occupational Titles (DOT). R. 74. The sit/stand option included in the second

hypothetical was the only limitation not defined in the DOT and therefore based on the VE's experience. *Id.*

After reviewing Dr. Hanna's RFC Questionnaire, the ALJ inquired about how much time an individual could be off task while performing these jobs. For the relevant positions, a person would be required to be on task 85-90% of the time. R. 79. The average tolerated amount of absence from work is one and three quarter days per month. *Id.*

Claimant's counsel posed an additional hypothetical, based largely on Dr. Hanna's RFC Questionnaire. Claimant's counsel described a hypothetical person of Claimant's age, education, and work experience who could sit or stand for forty-five minutes before needing to change positions, stand for a total of two hours in an eight-hour work day, take unscheduled breaks of approximately fifteen minutes, lift less than ten pounds frequently, use the right hand, fingers, or arm for no more than seventy percent of the day and use the left hand, fingers, and arm for no more than fifty percent of the day. R. 80. The VE testified that this person would not be able to sustain employment. *Id.* When the fifteen-minute breaks were replaced by the condition that the person could be absent for more than four days per month, the VE indicated that positions would not be available. R. 82.

## C.  Medical Evidence

### 1.  Dr. John D. Sonnenberg, M.D. – Midland Orthopedic Associates

Claimant's medical records date back to July 21, 2003, when she sought medical treatment at Midland Orthopedic Associates after tripping over a carpet roll at work, falling

on her left wrist, and suffering a hyperextension injury to that wrist.  R. 246.  X-rays and arthrograms ruled out fractures and dislocations, effectively narrowing the likely source of her pain to "ulnar abutment syndrome secondary to fall."  *Id*.  Claimant tried steroid injections, oral medication, and therapy to subdue the pain, "all to no avail."  R. 247.  On August 26, 2003, Dr. John D. Sonnenberg, M.D. ("Dr. Sonnenberg"), recommended and performed outpatient ulnar shortening ("osteotomy") of the left wrist.  R. 283.  On September 11, 2003, he removed the sutures and put her in a short arm cast.  R. 247.

Dr. Sonnenberg continued to monitor Claimant's recovery for nearly one year after the surgery.  R. 248-53.  Healing and initial progress in a prescribed work hardening program were good until Claimant began having pain in both of her shoulders in early February 2004.  R. 248-49.  X-rays showed subacromial spurs on both shoulders, the one on the right larger than the one on the left.  R. 249.  At that point, Dr. Sonnenberg opined that Claimant had "maxed out in her work hardening program," and could lift forty pounds occasionally.  R. 250.

Due to Claimant's lack of progress, Dr. Sonnenberg ordered an MRI in April 2004 which showed shoulder impingement syndrome.  R. 250-51.  Claimant had some initial success in reducing the impairment with oral medication and steroid injection.  *Id*.  Dr. Sonnenberg's notes in July 2004 reflect a discharge summary from the Case Manager at Mercy Work Capacity Program which indicates that Claimant had reached a "plateau" of lifting between thirty-five and forty pounds. R. 252, 424.  The Case Manager recommended, and Dr. Sonnenberg agreed, that Claimant be discharged and attempt to work with

accommodation. *Id*.

### 2. Dr. Pietro Tonino, M.D. – Loyola University Medical Center

In September 2004, Claimant decided to discontinue treatment with Dr. Sonnenberg and continue under Dr. Pietro Tonino, M.D. ("Dr. Tonino"), who Claimant had already seen twice. R. 253, 359-63. Following a visit on August 2, 2004, Dr. Tonino recommended restrictions of ten pounds lifting and no overhead or repetitive use of the left upper extremity without subacromial decompression surgery. R. 360. On November 4, 2004, Dr. Tonino performed Claimant's second surgery, a left shoulder decompression surgery with rotator cuff repair. R. 385.

After the surgery, Dr. Tonino routinely described Claimant as doing either well or extremely well and noted that she felt better than she did prior to surgery. R. 365-70. In April 2005, Claimant had "some restrictions with ten pounds lifting overhead with the left arm" but was progressing well. R. 370. Claimant then began another work hardening program under the same Case Manager at Mercy. R. 426-28. As of June 16, 2005, Claimant was "at maximal medical improvement" and had returned to work without restrictions. R. 385. According to the Case Manager, Claimant was able to lift eighty pounds from floor to waist. R. 427.

Claimant injured her left hand in October 2005. R. 384. In mid-January 2006, Claimant further "aggravated her left shoulder at work . . . when she hit some metal object with her arm." R. 383. A February 13, 2006 MRI showed a "possible recurrent rotator cuff tear and a small fenestrated tear" that indicated arthroscopic intervention. *Id*. By March 7,

2006, Claimant was receiving workers compensation, and was cleared for surgery on her left shoulder. R. 456. Claimant underwent her third and final surgery—arthroscopic rotator cuff repair and biceps tenotomy—on April 5, 2006. R. 382. Like her second surgery, her third was also performed by Dr. Tonino. *Id.*

Claimant resumed physical therapy after surgery, with restrictions remaining at five pounds lifting and no overhead repetitive use of the left upper extremity through the beginning of October 2006. R. 378, 433. She participated in another work conditioning program, R. 377, and, on November 28, 2006, Claimant was discharged from that program with the ability to undertake "light-medium to medium" physical demand capacity. R. 435. Her bilateral lift tolerance was forty-seven pounds from floor to waist and thirty-five pounds from waist to overhead, occasionally. *Id.* She could carry thirty-five pounds for twenty-five feet occasionally with the right arm, and twenty-five pounds for twenty-five feet occasionally with the left. *Id.*

### 3.    Dr. Francis Vincent, M.D. – State Agency Reviewing Physician

State agency reviewing physician Dr. Francis Vincent, M.D. ("Dr. Vincent"), completed an RFC Assessment on April 4, 2007. R. 395-402. Dr. Vincent reviewed Claimant's medical history and diagnosed her as status post left rotator cuff repair with several limitations. R. 395. He noted he did not have any treating or examining source statements in the file when he reviewed it. R. 401.

Dr. Vincent opined that Claimant has the following exertional limitations: she could

lift and/or carry twenty pounds occasionally; lift and/or carry ten pounds frequently; stand and/or walk around six hours in an eight-hour workday; and sit for the same amount of time. R. 396. Claimant's only postural limitation was that she should never climb ladders, ropes, or scaffolds and her only manipulative limitation was that she "should avoid overhead reaching" with the left shoulder. R. 397-98. She had unlimited gross and fine manipulation. *Id.*

### 4. Dr. Fauzia A. Rana, M.D. – State Agency Consulting Physician

Dr. Fauzia A. Rana, M.D. ("Dr. Rana"), performed a consultative examination for the state agency on January 24, 2008. R. 403. Dr. Rana's report is generally unremarkable, with the exception of left shoulder abduction, which was "115 degrees when [Claimant] complains of stiffness." R. 405. Dr. Rana observed, "Gross and fine manipulation of either hand is normal. She has no difficulty in lifting, holding, or turning objects with either hand. Dexterity is normal." *Id.* Dr. Rana's diagnostic impressions of Claimant were: degenerative arthritis with "no signs of acute inflammation" but "some limitation of movement in the left shoulder at present"; controlled high blood pressure; and obesity. *Id.*

### 5. Dr. Baharti Jhaveri, M.D. – State Agency Reviewing Physician

Dr. Bharati Jhaveri, M.D. ("Dr. Jhaveri"), completed an RFC assessment on March 5, 2008. R. 410-17. Dr. Jhaveri opined that Claimant can only occasionally lift fifty pounds, can frequently lift twenty-five pounds, can sit or stand for a total of six hours in an eight-hour work day, and is limited in pushing and/or pulling with her upper extremities. R. 411. Claimant was assessed as having limited overhead reaching with the left arm. R. 413. Dr.

Jhaveri did not have any treating source statements on file at the time of his review.  R. 416.

### 6.      Woodlawn Health Center

Claimant presented at Woodlawn Health Center on October 2, 2007 complaining of shoulder pain.  R. 481.  Treatment notes from October 2007 to November 2009 indicate continued pain in the left shoulder that was routinely treated with medication.  R. 481, 486, 488, 492, 500.  An x-ray of the shoulder in November 2007 showed moderate degenerative changes in the left acromioclavicular and shoulder joint.  R. 487.  According to the November 2, 2009 progress note, Claimant had "adequate" range of motion in the left shoulder and could raise that arm above shoulder level.  R. 500.  Woodlawn notes also show that Claimant suffered from hypertension, obesity, degenerative joint disease, and gastroesophageal reflux.  R. 480-500.

### 7.      Dr. Aseel Hanna, M.D. – Claimant's Treating Physician

Dr. Aseel Hanna, M.D. ("Dr. Hanna"), a doctor at Woodlawn Health Center and Claimant's most recent treating physician in that practice, completed an RFC Questionnaire on November 3, 2009.  R. 501-05.  Dr. Hanna diagnosed Claimant with hypertension, degenerative joint disease, rotator cuff tear surgery, and gastroesophageal reflux disease.  R. 501.  Claimant's symptoms include "arm pain secondary to rotator cuff tear surgery and tendonitis."  *Id*.  Claimant was prescribed medication for all of the diagnosed issues.  *Id*.

Dr. Hanna opined that Claimant's pain or other symptoms will occasionally be severe enough to interfere with the "attention and concentration needed to perform even simple

tasks," with "occasionally" defined as "6% to 33% of an 8-hour working day." R. 502. In addition, Claimant will "sometimes need to take unscheduled breaks" during the workday, with each break averaging around fifteen minutes. R.502. Claimant was likely to be absent from work "about four days per month." R. 504.

Dr. Hanna opined that Claimant cannot sit or stand for longer than forty-five minutes at a time, and cannot stand or walk for longer than about two hours per eight-hour working day. R. 503-04. Claimant can only lift or carry less than ten pounds frequently. *Id.* With regard to manipulative limitations, Claimant can only grasp, turn, twist, finely manipulate, and reach—including overhead—70% of an eight-hour day with her right side, and 50% of an eight-hour day with her left side. R. 504.

### D.     The ALJ's Decision – December 30, 2009

Following a hearing and review of the medical evidence, the ALJ rendered a decision partially favorable to Claimant, finding Claimant disabled for the purposes of both DIB and SSI between January 1, 2006 and December 31, 2006 but not disabled during all other relevant times. R. 16-39. The ALJ assessed Claimant's application for SSI under the familiar five-step sequential analysis.

At step one of the disability analysis, the ALJ found Claimant did not engage in substantial gainful activity during 2006, though did engage in substantial gainful activity in 2003 and 2005. R. 25. At step two, the ALJ found that Claimant had the severe impairments of: status post left ulnar osteotomy on August 18, 2003; status post left shoulder

12

decompression surgery on November 4, 2004; status post left rotator cuff repair and biceps tenotomy on April 5, 2006; obesity; controlled hypertension; and moderate degenerative changes of the left shoulder. *Id.* At step three, the ALJ found that Claimant's impairments did not meet or medically equal a listed impairment under the Social Security Regulations. R. 28, 30.

The ALJ then proceeded through the remainder of the five-step process in two parts: first for the period beginning on January 1, 2006 and ending on December 31, 2006 ("the Disabled Period"); and second, for the periods between July 2, 2003 and December 31, 2005 and between January 1, 2007 and the date of the decision ("the Not-Disabled Periods").

### 1. The Disabled Period (January 1, 2006 through December 31, 2006)

Regarding 2006, the ALJ determined at step four that Claimant had the RFC to perform less than sedentary work; specifically, the ALJ concluded: "[Claimant] could lift and carry less than 5 pounds. The claimant was limited to sitting less than 4 hours and standing and walking less than 4 hours in an 8-hour workday, and was unable to use her left upper extremity even for occasional reaching and fine and gross manipulation." *Id.* During this period, Claimant was unable to perform past relevant work. R. 29. At step five, the ALJ found that given Claimant's age, education, and non-transferability of job skills there were no jobs that existed in significant numbers in the national economy that Claimant could have performed. *Id.* Therefore, Claimant was under a disability between January 1, 2006 and December 31, 2006.

13

### 2. The Not-Disabled Periods (July 2, 2003 through December 31, 2005 and January 1, 2007 through the date of the decision)

Regarding the Not-Disabled periods, the ALJ then determined that Claimant retained the RFC to perform a reduced range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b).  R. 30.  The ALJ concluded that Claimant could: lift or carry no more than ten pounds; sit or stand/walk for six hours in an eight-hour workday; and only occasionally push and pull with the left arm or perform fine and gross manipulation with the left non-dominant upper extremity.  R. 30-31.  Claimant could be expected to be off task ten to fifteen percent of the workday in addition to normal breaks, and may be absent one and three-quarters days each month.  R. 31.  With the help of the VE's testimony, the ALJ characterized this profile as "light."  *Id*.

The ALJ evaluated Claimant's credibility, finding that while her "medically determinable impairments could reasonably be expected to produce the alleged symptoms," Claimant's "statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible" during the Not-Disabled Periods.  R. 31-32.  Specifically, Claimant's allegations regarding pain, limitations, or side effects from her medication were not supported by objective medical evidence.  *Id*.

The ALJ found that medical improvement related to the ability to work occurred on January 1, 2007.  R. 30, 32.  Since January 1, 2007, Claimant has not been able to perform past relevant work.  R. 32.  However, from July 2, 2003 through December 31, 2005 and from January 1, 2007 through the date of the decision, a significant number of jobs existed

in the national economy that Claimant could perform. Thus, the ALJ determined that Claimant was disabled under the Social Security Act only during 2006, and not for the Not-Disabled Periods. R. 35.

## II.  LEGAL STANDARDS

### A.  Standard of Review

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A decision by an ALJ becomes the Commission's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). Under such circumstances, the district court reviews the decision of the ALJ. *Id*. The reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Id*.; *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even when the record contains adequate evidence to support the decision, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or an adequate discussion of the issues, it must be remanded. *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).

Though the standard of review is deferential, a reviewing court must "conduct a

critical review of the evidence" before affirming the Commissioner's decision. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010). Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards and whether substantial evidence supports the findings. *Id.*

**B.    Disability Standard**

Disability insurance benefits are available to a claimant who can establish she is under a "disability" as defined by the Social Security Act. *Liskowitz v. Astrue*, 559 F.3d 736, 739-40 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a disability if he is unable to perform his previous work and cannot, considering his age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

A five-step sequential analysis is utilized in evaluating whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i-v). The ALJ must inquire, in the following order: (1) whether

the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing other work. *Id*. Once the claimant has proven she cannot continue her past relevant work due to physical limitations, the ALJ must decide whether other jobs exist in the economy that the claimant can perform. *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008).

## III. DISCUSSION

Claimant raises three issues for judicial review: (1) whether the ALJ rendered an improper RFC by discounting Claimant's treating physician's opinion and giving significant weight to the opinion of the state agency review doctor; (2) whether the ALJ improperly evaluated the credibility of Claimant's testimony; and (3) whether the ALJ improperly relied upon testimony of the VE. The Court addresses each argument in turn, ultimately concluding that the ALJ's decision was supported by substantial evidence.

## A. The ALJ Reasonably Weighed the Medical Opinions of Claimant's Treating Physician and the State Agency Physician.

The ALJ gave significant weight to the opinion of Dr. Vincent, the state agency physician, and little weight to the opinion of Claimant's treating physician, Dr. Hanna. R. 30. Specifically, the ALJ found that Dr. Vincent's opinion was consistent with the medical records. On the other hand, Dr. Hanna did not offer any objective basis for his conclusion that Claimant cannot stand or walk more than two hours per day, he primarily repeats

Claimant's subjective complaints in his report, and there was no objective basis in the record to support Dr. Hanna's opinion that Claimant would be absent four days per month and require unscheduled fifteen-minute breaks. R. 30. Claimant contends the ALJ erroneously discounted Dr. Hanna's opinion and improperly gave controlling weight to Dr. Vincent's opinion, thus rendering an improper RFC.

An ALJ makes an RFC determination by weighing all of the relevant evidence of record. 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, 1996 SSR LEXIS 5, *7. In doing so, she must determine what weight to give the opinions of the claimant's treating physicians. 20 C.F.R. § 404.1527. A treating physician's opinion is entitled to controlling weight if it is "well supported by medical findings and not inconsistent with other substantial evidence in the record." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (citing 20 C.F.R. § 404.1527(d)(2)). However, an ALJ may discount such an opinion as long as she "minimally articulates [her] reasons" for doing so. *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). This is so, in part, because a treating physician may be sympathetic to a patient and "too quickly find disability." *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). As a result, "if the treating physician's opinion is inconsistent with the consulting physician's opinion . . . or based solely on the patient's subjective complaints, the ALJ may discount it." *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (citations omitted).

In the case at bar, the ALJ sufficiently articulated her reasons for discounting Claimant's treating physician's opinion. First, the ALJ noted that neither Dr. Hanna's report itself nor any longitudinal treatment records support the assertion that Claimant cannot stand

or walk more than two hours per eight-hour workday.  R. 30.  When Claimant saw her physician after a treatment gap of sixteen months, she did not report any new complaints.  *Id*.  Next, the ALJ could find no objective basis in Claimant's case file for Dr. Hanna's opinion that Claimant would likely be absent from work four days per month and would require an unidentified number of unscheduled fifteen-minute breaks.  *Id*.  The ALJ explained both that Dr. Hanna's report appeared "to repeat [Claimant's] subjective complaints and lack[ed] reference" to objective medical evidence, and that none of the consulting physicians described similar limitations on Claimant's activity.  *Id*.  The ALJ therefore expressly stated that she found particular portions of Dr. Hanna's opinion not consistent with medical evidence and based only on Claimant's subjective complaints.  This is an appropriate reason to not give controlling weight to a treating source's opinion.  *Ketelboeter*, 550 F.3d at 625.

Dr. Hanna was given the option to identify objective medical evidence and did not do so.  Where the RFC questionnaire asked that he identify clinical findings and objective signs concerning his patient's impairments, Dr. Hanna left those lines blank.  R. 500.  Notwithstanding this omission, the ALJ considered the entire record and, as in *Ketelboeter*, appropriately observed that there was minimal objective evidence supporting the limitations identified by the treating doctor and that those conclusions were based primarily on subjective complaints.

Moreover, the ALJ expressly included in the RFC those limitations contained in Dr. Hanna's opinion that she found had support in the record.  The ALJ agreed with Dr. Hanna

that Claimant's left upper extremity was limited to occasional manipulation and reaching. *Id*. Further, the ALJ found that the 10-15% off-task time during the day, in addition to regular breaks, adequately addressed, and was consistent with, Dr. Hanna's opinion that Claimant would need breaks. *Id*.

The ALJ gave substantial weight to the assessment of Dr. Vincent. *Id*. She did so because the Claimant's limitations in the Not-Disabled Periods—that Claimant can sit and stand/walk six hours per workday—were "consistent with medical records and the consulting examination." *Id*. Even so, the ALJ gave Claimant "the benefit of the doubt" on her lifting capacity, limiting it to ten pounds rather than the twenty-five assessed by Dr. Vincent. *Id*. Similarly, the ALJ described why she gave less weight to Dr. Jhaveri's opinion, explaining that lifting "25/50 pounds is inconsistent with physical therapy and orthopedic treating records." *Id*. Thus, the ALJ did not improperly dismiss the opinions of a treating source and accept the opinions of the state agency doctors.

Rather, the ALJ properly assessed the various limitations put forth by both the treating and state agency physicians, considered whether those opinions were supported by other evidence, based on subjective or objective observations, and consistent with treatment notes. The ALJ sufficiently articulated her reasons for discounting Dr. Hanna's opinion, and she also proffered sufficient reasons for the weight she gave to the opinions of Dr. Vincent and Dr. Jhaveri. Accordingly, the Court finds that the ALJ reasonably weighed the various medical opinions and evidence.

**B.    The ALJ's Credibility Finding Regarding Claimant's Testimony Was Not**

**Patently Wrong.**

Claimant further contends the ALJ improperly discredited her testimony on the extent and frequency of her pain and limitations. In reviewing credibility assessments, "[b]ecause the ALJ is in the best position to determine the credibility of the witness, the Court reviews that determination deferentially, and will overturn a credibility determination only if it is patently wrong." *Craft*, 539 F.3d at 678 (quotations omitted). To determine whether a credibility determination is "patently wrong," the Court examines whether the ALJ's determination was reasoned and supported. *Jens v. Barnhart*, 347 F.3d 209, 213-14 (7th Cir. 2003). The ALJ need only "minimally articulate his or her justification for rejecting or accepting specific evidence of disability." *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). However, the ALJ may not ignore the claimant's statements regarding pain or other symptoms or disregard them solely because they are not substantiated by objective medical evidence. SSR 96-7p, 1996 WL 374186, at *1 (S.S.A.); *see also Carradine v. Barhart*, 360 F.3d 751, 753 (7th Cir. 2004).

In the case at bar, the ALJ determined "[C]laimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms." R. 31. However, the ALJ found that Claimant's "statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible [during the Not-Disabled Periods] to the extent they are inconsistent with the objective medical evidence and the [RFC] assessment." *Id.*

The fact that Claimant's pain allegations or other symptoms are not supported by

medical evidence is, alone, insufficient to discredit her testimony. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) ("[T]he ALJ may not discredit a claimant's testimony about her pain and limitations solely because there is no objective medical evidence supporting it."); *Carradine*, 360 F.3d at 753. However, this does not mean that an ALJ is prohibited from considering the lack of objective evidence in discounting a claimant's subjective complaints. *Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) ("But *Carradine* does not imply that an ALJ can *never* consider the lack of objective evidence in rejecting a claimant's subjective complaints.") (emphasis in original). Rather, relevant factors include: objective medical evidence; a claimant's own statements about symptoms; statements and other information provided by treating or examining physicians; activities of daily living; location, duration, frequency, and intensity of pain and other symptoms; precipitating and aggravating factors; medications; treatment and other measures taken to relieve pain; observations by agency employees; and conflicts between a claimant's statements and other evidence. *See* 20 C.F.R. § 404.1529(c); SSR 96-7p, 1996 WL 374186, at *1, *3.

The ALJ considered a range of appropriate factors and raised several points regarding inconsistencies with objective medical evidence and other evidence. R. 31-32; SSR 96-7p ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."). The ALJ compared Claimant's testimony at the hearing about pain medications with her prescription records and reasonably found that Claimant's prescription records for the year prior to the ALJ hearing showed dosages neither as frequent nor as strong as those articulated by Claimant. R. 31.

The ALJ compared Claimant's testimony that she can hardly use her left arm for anything with other medical evidence, including physical therapy and orthopedic records dated November 2006 indicating that she was able to lift twenty-five pounds with the left arm alone. *Id.* The ALJ considered the sixteen-month gap in treatment as a sign that Claimant's pain was not as severe as alleged. *Id.* The ALJ considered inconsistencies between the assessment of Claimant's treating physician and her own allegations of limitations. R. 31-32. The ALJ considered the fact that while Claimant complains of shortness and breath and side effects from the medications, she has not reported either of these problems to doctors. R. 32. The ALJ observed that Claimant lifted her left arm above her head to hang her coat at the hearing without any visible discomfort. *Id.* Finally, the ALJ noted that Claimant appears to sleep at night without any discomfort. *Id.*

The ALJ reasonably considered this litany of inconsistencies and lack of objective medical support and concluded that Claimant's allegations of pain and limitations were not entirely credible. The ALJ sufficiently articulated her credibility findings and supported those findings with reasoned analysis. Thus, the credibility finding was not "patently wrong."

## C.     The ALJ Relied Upon Substantial Evidence in Determining Claimant's RFC.

Substantial evidence supports the ALJ's RFC determination. As noted above, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The ALJ concluded that Claimant can: lift or carry no more than ten pounds; sit or stand/walk for six hours in an

eight-hour workday; and only occasionally push and pull with the left arm or perform fine and gross manipulation with the left non-dominant upper extremity. R. 30-31. Claimant could be expected to be off task ten to fifteen percent of the workday in addition to normal breaks, and may be absent one and three-quarters days each month. R. 31. Substantial evidence supports this RFC.

In November 2006, Claimant was discharged from the Work Capacity Program with the ability to undertake "light-medium to medium" physical demand capacity. R. 435. Her bilateral lift tolerance was forty-seven pounds from floor to waist and thirty-five pounds from waist to overhead, occasionally. *Id.* She could carry thirty-five pounds for twenty-five feet occasionally with the right arm, and twenty-five pounds for twenty-five feet occasionally with the left. *Id.* When compared with the ten-pound lift/carry limitation contained in the ALJ's RFC, the Work Capacity Program evidence supports an RFC with even fewer limitations.

In April 2007, Dr. Vincent opined that Claimant could lift and/or carry twenty pounds occasionally, lift and/or carry ten pounds frequently, stand and/or walk around six hours in an eight-hour workday, and sit for the same amount of time. R. 396. The ALJ included more restrictive limitations by giving the Claimant off-task and off-work time not mentioned by Dr. Vincent. The ALJ also included in her RFC only the frequent ten pound lift/carry limitation and did not include the less restrictive twenty pound limitation. Thus, evidence from Dr. Vincent also supports an RFC with fewer limitations than those determined by the ALJ.

In January 2008, Claimant saw Dr. Rana. Dr. Rana assessed that "[g]ross and fine manipulation of either hand is normal." R. 405. Likewise, Dr. Rana stated that Claimant has "no difficulty in lifting, holding, and turning objects with either hand." *Id.* Accordingly, this piece of medical evidence, like the two above, is less restrictive than the ALJ's RFC determination. Additionally, a note from Claimant's treating physician in November 2009 indicates that Claimant had "adequate" range of motion in the left shoulder and could "raise arm above shoulder level." R. 500.

This Court finds that the ALJ not only relied upon substantial evidence for her findings of not-disabled after January 1, 2007, but also gave Claimant the benefit of the doubt by giving her the whole of 2006 under a disability (rather than ending in November 2006 when the Work Capacity Program discharged Claimant to return to work, R. 435), allowing her greater limitations than those assessed by any of the State physicians, and granting more off-task and off-work time than was supported by the evidence of record.

**D.      The ALJ Properly Relied Upon the Testimony of the Vocational Expert.**

Finally, Claimant asserts that the ALJ improperly relied upon the VE's testimony at step five. While a claimant bears the burden of proof at each of the first four steps of the disability determination, *Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005), the government bears the burden of proof at step five to show that a significant number of jobs exist in the national economy which a claimant can perform despite his or her limitations.[1]

---

[1] Claimant first argues that the VE's failure to provide specific DOT numbers for each position identified renders a thorough review of the ALJ's step five analysis impossible, but does

*Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

ALJs often rely on the Dictionary of Occupational Titles ("DOT") and the testimony of VEs to determine whether the government has met its burden at step five. *Id*. ALJs are required to take administrative notice of the DOT and VEs often supplement the information contained in the DOT. *Id*. Once an ALJ decides to call a VE to testify, the ALJ must make sure the testimony is in line with the Social Security Rulings. SSR 00-4p, 2000 WL 1898704, at *2.

To do so, SSR 00-4p requires an ALJ to inquire whether a VE's testimony conflicts with information provided in the DOT. *Id*. at *4. The ALJ in this case did so and the VE indicated that, other than the sit/stand option, her testimony was consistent with the DOT. R. 74. A claimant's counsel, on cross examination, has the opportunity to draw the ALJ's attention to any of these conflicts. In this case, Claimant's counsel did not raise any conflicts between the VE's testimony and the DOT at the hearing.

However, a claimant is not required to raise "apparent" inconsistencies at the hearing. *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006). On appeal, a claimant can argue that the ALJ failed to resolve "apparent" conflicts; that is, the conflicts were so obvious that the ALJ should have picked up on them without assistance of counsel or the VE. *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008) ("Still, the failure of Overman's counsel to

---

not cite any legal authority for this position. Moreover, citation to the DOT numbers is not required. *See Mueller v. Astrue*, No. 10 C 7080, 2012 U.S. Dist. LEXIS 68690, *64-65 (N.D. Ill. May 17, 2012) ("While the VE never listed the DOT numbers for any positions, SSR 00-4p, 2000 SSR LEXIS 8 does not demand any citation to code numbers."). If Claimant's counsel felt that information was important, she could have elicited that information at the hearing.

identify the conflicts at the time of the hearing is not without consequence. Overman now has to argue that the conflicts were obvious enough that the ALJ should have picked up on them without any assistance, for SSR 00-4p requires only that the ALJ investigate and resolve apparent conflicts between the VE's evidence and the DOT."). Where there is "an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled." SSR 00-4p at *2; *see also Weatherbee*, 649 F.3d at 570; *Overman*, 546 F.3d at 463.

The question, then, is whether there was a conflict between the VE's testimony and the DOT that was so obvious that the ALJ should have picked up on it without any assistance. *Overman*, 546 F.3d at 463. Claimant argues there was such an apparent conflict. The Court disagrees.

Claimant argues that the ALJ should have known that the positions cited by the VE (hostess and information clerk), and ultimately relied upon by the ALJ, require frequent reaching and handling and should have known that this was not consistent with non-dominant left arm limitations of occasional pushing and pulling, occasional fine and gross manipulations, and no reaching above the shoulder. This is not an apparent conflict. Courts in this circuit have found apparent conflicts only in far more obvious situations. *See, e.g.*, *Overman* 546 F.3d at 463-65 (finding an apparent conflict where the VE gave different answers regarding whether jobs were available for similar hypotheticals on direct and cross examination); *Dross-Swart v. Astrue*, No. 2:11 cv 175, 2012 U.S. Dist. LEXIS 74678, at

*53-54 (N.D. Ind. May 30, 2012) (finding an apparent conflict where the ALJ determined the claimant could not be exposed to moderate noise and the positions cited require exposure to moderate or loud noise).  Less obvious conflicts have not been found apparent.  *See, e.g.*, *Russell v. Astrue*, No. 09 C 5702, 2012 U.S. Dist. LEXIS 25247, at *53-55 (N.D. Ill. Feb 24, 2012) (finding no apparent conflict where the ALJ asked whether jobs exist for a person who could perform only sedentary work with a sit/stand option but the DOT describes sedentary work as including occasional standing and walking).

Moreover, the Court finds that, obvious or not, the jobs cited do not conflict with Claimant's RFC.  The RFC, which is supported by substantial evidence, includes occasional restrictions only on Claimant's left side.  Claimant's right side has no limitations.  Occasional limitations on the non-dominant side do not so obviously conflict with the description of the hostess and information clerk positions to constitute an apparent conflict.  Thus, the VE's testimony constitutes substantial evidence upon which the ALJ was entitled to rely.

Finally, Claimant argues that if the hostess jobs were removed and Claimant were only capable of performing unskilled information clerk positions, the 2000 information clerk positions would reasonably be halved, reducing the number to 1000 jobs, which would not be substantial.  However, "[a]s few as 174 jobs has been held to be significant, and it appears to be well established that 1,000 jobs is a significant number."  *Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009) (citations omitted).  Contrary to Claimant's argument that this precedent is limited to the Milwaukee area, that figure has been cited in this district as applicable in the Chicago metropolitan area as well.  *See, e.g.*, *Hunt v. Astrue*, 10 C 2874,

2012 U.S. Dist. LEXIS 51280, at *37 (N.D. Ill. Mar. 26, 2012). Thus, even based on Claimant's own reduction of jobs available to her, there are a significant number of jobs that exist that Claimant can perform.

## IV.    CONCLUSION

For the reasons set forth in this opinion, the Court denies Claimant's motion for summary judgment or remand of the decision of the Commissioner and grants the Commissioner's motion to affirm the Commissioner's decision.

SO ORDERED THIS 2nd DAY OF JULY, 2012.

_Morton Denlow_
_____
**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies sent to:**

| | |
|---|---|
| Frederick J. Daley, Jr. | Zachary D. Clopton |
| Richard Y. Hu | Assistant United States Attorney |
| Daley, DeBofsky & Bryant | 219 South Dearborn Street |
| 55 West Monroe Street | Chicago, Illinois 60604 |
| Suite 2440 | |
| Chicago, Illinois 60603 | Joo Hui Kim |
| | Assistant Regional Counsel |
| | 200 West Adams Street |
| | Suite 3000 |
| | Chicago, Illinois 60606 |
| **Counsel for Plaintiff** | **Counsel for Defendant** |